UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re: ) Case No. 6:14-bk-07685-KSJ

MAXWEST ENVIRONMENTAL ) Chapter 7
SYSTEMS, INC.,
)
Debtor.
)

**WELLS FARGO BANK, N.A.'S CONSENT MOTION
FOR RELIEF FROM THE AUTOMATIC STAY**

**NOTICE OF OPPORTUNITY TO
OBJECT AND REQUEST FOR HEARING**

Pursuant to Local Rule 2002-4, the Court will consider this motion, objection, or other matter without further notice or hearing unless a party in interest files a response within 21 days from the date set forth on the proof of service attached to this paper plus an additional three days for service. If you object to the relief requested in this paper, you must file your response with the Clerk of the Court at 400 W. Washington Street, Orlando, Florida 32801 and serve a copy on the movant's attorney, Timothy R. Buskirk, Esq., Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida 32202.

If you file and serve a response within the time permitted, the Court may schedule and notify you of a hearing, or the Court may consider the response and may grant or deny the relief requested without a hearing. If you do not file a response within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, will proceed to consider the paper without further notice or hearing, and may grant the relief requested.

Pursuant to §§ 362(d), 506 and 553 of the Bankruptcy Code, Wells Fargo Bank, N.A. ("Wells Fargo") moves the Court for relief from the automatic stay, and in support thereof says:

1.    MaxWest Environmental Systems, Inc. (the "Debtor") filed its voluntary petition for relief under Chapter 7 of the Bankruptcy Code on July 3, 2014 (the "Petition Date").

2.      Prior to the Petition Date, Wells Fargo provided commercial credit card services to the Debtor (the "Credit Card Services") pursuant to that certain WellsOne Commercial Card Express Agreement effective April 29, 2011 with an initial credit limit of $75,000.00 (the "Commercial Card Agreement").  A copy of the Commercial Card Agreement is attached as Exhibit A.

3.      In addition to providing the Credit Card Services, Wells Fargo also provided account services to the Debtor with respect to account numbers xxxxxx4535, xxxxxx7045 and xxxxxx7216 maintained by the Debtor with Wells Fargo (the "Account Services").

4.      As security for all indebtedness owed by the Debtor to Wells Fargo including, but not limited to, payment and performance of all present and future indebtedness in connection with the Credit Card Services, the Commercial Card Agreement, and the Account Services, the Debtor granted to Wells Fargo a security interest in that certain money market savings account maintained by the Debtor with Wells Fargo identified as account number xxxxxx7216 (the "Savings Account"), including all funds on deposit therein and any interest earned thereon, pursuant to that certain Security Agreement dated May 2, 2011 (the "Security Agreement").  A copy of the Security Agreement is attached as Exhibit B.

5.      Wells Fargo has possession and control of the Savings Account, and therefore pursuant to §§ 679.1041(1)(a) and 679.3141(1), Florida Statutes, Wells Fargo holds a perfected security interest in the Savings Account.

6.      As of the Petition Date, the Debtor owes the total amount of $12,994.96 (the "Pre-Petition Balance") to Wells Fargo as follows: (i) Credit Card Services charges in the amount of $11,750.90, and (ii) Account Services charges in the amount of $1,180.53 on account number xxxxxx4535, $47.75 on account number xxxxxx7045, and $15.78 on account number xxxxxx7216.

2

As of the Petition Date, the balance of the Savings Account was $100,218.03. A copy of the Affidavit of Roanne Disalvatore, Vice President of Wells Fargo's Credit Resolution Group, in support of this motion and setting forth the Pre-Petition Balance is attached as <u>Exhibit C</u>.

7. Pursuant to the request of the Chapter 7 trustee (the "Trustee"), Wells Fargo (i) terminated the Credit Card Services on July 25, 2014, and (ii) closed account number xxxxxx4535 on or before July 31, 2014, remitting any funds in the account to the Trustee. Account number xxxxxx7045 was closed prior to the Petition Date.

8. Paragraph 16 of the Commercial Card Agreement provides that:

> "Wells Fargo shall have the right to, in its sole discretion, set-off or recoup any obligation of Customer to Wells Fargo under this Agreement or otherwise against any obligation Wells Fargo owes to Customer, including a set-off against any deposit account(s) Customer has with Wells Fargo to the extent permitted by law."

9. Furthermore, Paragraph 15 of the Security Agreement provides that:

> "Debtor shall pay to Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees (to include outside counsel fess and all allocated costs of Bank's in-house counsel), expended or incurred by Bank in connection with (a) the perfection and preservation of the Collateral or bank's interest therein, and (b) the realization, enforcement and exercise of any right, power privilege or remedy conferred by this Agreement, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Bank or any other person) relating to Debtor or in any way affecting and of the Collateral or bank's ability to exercise any of its rights or remedies with respect thereto. All of the foregoing shall be paid by Debtor with interest from the date of demand until paid in full at a rate per annum equal to the greater of ten percent (10%) or bank's Prime Rate in effect from time to time."

10.     Accordingly, Wells Fargo is entitled to deduct or setoff the Pre-Petition Balance owed by the Debtor to Wells Fargo from the Savings Account, in addition to all post-petition charges, expenses, fees (including, but not limited to, attorneys' fees) and costs Wells Fargo incurs in connection with the Credit Card Services, the Commercial Card Agreement, the Account Services, and its efforts to recover from the Debtor such amounts by realizing on the funds in the Savings Account, which serve as Wells Fargo's collateral.

11.     The Trustee acknowledges and agrees with the statements set forth in this motion and consents to the relief requested.  Additionally, the Trustee consents to the waiver of the 14-day period provided by Rule 4001(a)(3), Federal Rules of Bankruptcy Procedure.  A copy of the Trustee's written consent is attached as Exhibit D.

12.     Wells Fargo and the Trustee agree to the form of the proposed order (the "Order"), a copy of which is attached as Exhibit E, granting Wells Fargo's request for relief from the automatic stay, authorizing Wells Fargo to setoff the Pre-Petition Balance it is owed against the funds in the Savings Account, and permitting Wells Fargo authority to retain possession of the Savings Account for the period described in the Order to allow for final calculation of all post-petition trailing charges, together with all related post-petition costs, fees (including, but not limited to, attorneys' fees) and expenses, all of which are recoverable by Wells Fargo from the Savings Account, in accordance with the terms of the Order.

4

WHEREFORE, Wells Fargo respectfully requests the Court to enter the Order, and grant such other relief as is just and proper.

SMITH HUSLEY & BUSEY

By _____
Michael E. Demont
Timothy R. Buskirk

Florida Bar Number 364088
Florida Bar Number 58314
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
mdemont@smithhulsey.com
tbuskirk@smithhulsey.com

Attorneys for Wells Fargo Bank, N.A.

Consent of the Chapter 7 Trustee

By _____
Richard B. Webber, as Chapter 7
Trustee for the Bankruptcy Estate of
MaxWest Environmental Systems, Inc.

Post Office Box 3000
Orlando, Florida 32802
(407) 425-7010

Chapter 7 Trustee

5

**Certificate of Service**

I hereby certify that a copy of the foregoing was furnished by U.S. Mail to: MaxWest Environmental Systems, Inc., 11485 International Parkway, Suite 1031, Lake Mary, FL 32746; Steven D. Winchester, Winchester Consulting Group LLC, 400 Continental Blvd., 6th Floor, El Segundo, CA 90245; and by CM/ECF electronic notice to: Robert A. Soriano, Greenberg Traurig, P.A., 625 East Twiggs Street, Suite 100, Tampa, FL 33602; Richard B Webber, Trustee, Post Office Box 3000, Orlando, FL 32802; United States Trustee - ORL7/13, Office of the United States Trustee, George C Young Federal Building, 400 West Washington Street, Suite 1100, Orlando, FL 32801; and all other parties receiving CM/ECF electronic notice in this case, this 15th day of August, 2014.

_____
Attorney

877851.4

6

# EXHIBIT A

## WELLSONE® COMMERCIAL CARD EXPRESS AGREEMENT

This WellsOne® Commercial Card Express Agreement (this "**Agreement**") is made and entered into effective as of April 29, 2011 (the "**Effective Date**"), by and between Wells Fargo Bank, National Association ("**Wells Fargo**") and MaxWest Environmental Systems, Inc. ("**Customer**").

### Introduction

This Agreement governs the Visa® *WellsOne* Commercial Card Express Card ("**Card**") issued by Wells Fargo for use by Customer and its designated employees, subsidiaries, affiliates, agents and representatives ("**Cardholders**"). In this Agreement, "Card" shall mean individually and collectively, all *WellsOne* Commercial Card Express Cards and account numbers issued to Customer, Cardholders and the associated accounts including all card-not-present transactions and account numbers. The transactions made using the Card constitute extensions of credit by Wells Fargo to Customer and not to individual employees, or agents of Customer. In order to participate in the *WellsOne* Commercial Card program, Customer shall at all times maintain ten (10) or more Cards. Attachment A (Program Information), Attachment B (Program Administrator) and Attachment C (Fee Schedule) are incorporated into this Agreement. For good and valuable consideration, and intending to be legally bound hereby, Customer and Wells Fargo agree to each and every term and condition of this Agreement as set forth below:

1. **Permitted Uses of Card; Promise to Pay; Credit Limit.** The Card may be used for Cardholders' Customer-Related purchasing, travel and entertainment, general payables and fleet purchases; to the extent such functionality is offered to Customer by Wells Fargo. Customer agrees that the Card shall be used for business purposes only. In no event shall the Card be used for any transaction that is unlawful or illegal under any applicable law, including but not limited to, "**restricted transactions**" as defined in the Unlawful Internet Gambling Enforcement Act of 2006 and Regulation GG issued thereunder. Except as otherwise provided in the "**Liability for Unauthorized Use**" Section below, Customer agrees to pay Wells Fargo, when due, the total of all purchases made with the Card. Customer also promises to pay the total of all other fees and charges due on the Card, as stated in this Agreement or as otherwise agreed to by Customer, and all costs and expenses, including all reasonable attorney's fees, and other reasonable legal costs incurred by Wells Fargo in enforcing this Agreement. Customer agrees that the total of all transactions charged to all Cards outstanding at any time shall not exceed the Credit Limit specified in Attachment A, or as may be changed from time to time. Customer agrees that it is responsible for repaying outstanding balances under the Card, including but not limited to those that exceed its Credit Limit. Wells Fargo may change the Credit Limit at any time and will promptly notify Customer as may be required by applicable law. Termination or expiration of this Agreement does not terminate Customer's obligation for all amounts owed pursuant to this Agreement.

2. **Debit Authorization.** Customer hereby authorizes and directs Wells Fargo to pay the total of all amounts charged on the Card as a result of purchases, other transactions, fees, charges, costs and expenses by debiting Customer's Wells Fargo Demand Deposit Account as indicated on Attachment A (the "**Account**"), on the fifth calendar day (or next Business Day if the calendar day is not a Business day) following the date of each *WellsOne* Commercial Card billing statement is provided to Customer. A "**Business Day**" shall mean any day (except Saturday or Sunday) that Wells Fargo is open for business. Wells Fargo may debit the Account at any time for the purpose of settling Card transactions and payoffs of any fees, charges, costs and expenses as stated in this Agreement or as otherwise agreed to and owed by Customer. If the funds in Customer's Account are insufficient to pay when due any amount owing to Wells Fargo hereunder, Wells Fargo may exercise any of its rights under the Security Agreement: Specific Rights to Payment between Customer and Wells Fargo as referenced in Section Twenty (20) below and captioned "Secured Obligations".

3. **Authorizations.** All transactions on Customer's Card are subject to prior approval by Wells Fargo ("**Authorizations**"). Wells Fargo reserves the right to limit the number of Authorizations given during any period of time (day, weekend, week, etc.) and Wells Fargo may deny an Authorization if Wells Fargo suspects that the Card is being used without Customer's permission. In the event the Authorization system is temporarily unavailable, an Authorization may be unable to be given even though the transaction would not exceed the Credit Limit and the Card is in good standing. For security reasons, Wells Fargo cannot explain the details of how the authorization system works. Wells Fargo shall not be liable for failing to give any such Authorization. Wells Fargo may, but is not required to, authorize transactions that will cause the balance on an Account to exceed the Credit Limit, and Customer agrees it is liable for any such transactions. In addition, Wells Fargo reserves the right to deny transactions or authorizations from merchants apparently engaging in the Internet gambling business or identifying themselves through the Card transaction record or otherwise as engaged in such business.

4. **Program Administrator.** Wells Fargo will require, and is authorized to rely on, written instructions it receives from the Customer's Program Administrator(s) named on Attachment B with regard to the following matters, without limitation: issuance of individual Cards to Cardholders, establishment of and changes to credit limits on individual Cards, notification of disputed transactions, and termination of individual Cards. Customer may substitute, remove or designate additional Program Administrators by written notice to Wells Fargo signed by an authorized officer of Customer. Notwithstanding any other

provision of this Agreement to the contrary, if Customer enrolls to administer its Commercial Card program using the Internet to access Card information, Customer agrees that the primary Program Administrator named on Attachment B has full authority to substitute, remove or designate additional Program Administrators, each of whom has the full authority of a Program Administrator including authority to designate other Program Administrators, and that written notice signed by an authorized officer of Customer is required only to substitute the primary Program Administrator. The Program Administrator named as Program Administrator 1 on Attachment B shall be considered the primary Program Administrator.

**5.  Liability for Unauthorized Use.**  Customer shall be liable for all unauthorized use of the Card in any amount at any time, unless and until Customer has notified Wells Fargo that the Card or Card number has been lost, stolen or misappropriated or that the person or vehicle (in the event of a fleet program) in whose name the Card has been issued is no longer authorized to use the Card (for example, upon termination of employment). Notification concerning unauthorized use shall be made by Customer calling the customer service number most recently provided by Wells Fargo; provided however, that Customer shall cooperate with Wells Fargo to complete any required written correspondence requested by Wells Fargo. Customer shall be responsible for full payment of all purchases, fees and charges incurred prior to such notification, regardless of when actually posted to Customer's account.

**6.  Visa Liability Waiver Program.**  Subject to applicable Visa terms and conditions, Customer may be eligible for coverage under Visa's Liability Waiver Program which provides coverage against employee misuse of the Card. Customer should consult the Visa Liability Waiver Program brochure available upon request from Wells Fargo for terms and conditions of coverage. Customer acknowledges that Wells Fargo is not responsible for providing any form of liability protection program on Customer's behalf and that Wells Fargo makes no representations or warranties regarding any such program that may be offered by third parties.

**7.  Department Cards.**  In the event Customer requests Wells Fargo to issue Cards to Customer in a department, group name or other such designation not bearing a name or signature of an authorized employee or individual, all such Cards shall be deemed as "Department Cards". Customer hereby represents, acknowledges and agrees that: (i) such Department Cards will be used by more than one authorized employee or individual, (ii) physical Cards may or may not be issued in conjunction with such Department Cards, and (iii) issuance of Department Cards may increase the risk of fraudulent or unauthorized use; as such, Customer is responsible for all security and protection of the Department Cards and any and all Customer procedures concerning the use of such Department Cards by its Cardholders.

**8.  Billing Disputes, Chargeback Requests.**  Customer may dispute amounts reflected on a billing statement that Customer reasonably believes to be incorrect because (i) the amount shown on the billing statement does not reflect the actual face value of the transaction, (ii) the transaction shown on the billing statement did not result from the use of the Cards, (iii) the statement reflects fees not properly accrued under this Agreement, or (iv) the transaction is disputable with the honoring merchant under applicable Visa rules, however, such dispute is subject to the procedures and liability provisions set forth in this section or other sections of the Agreement. In the event of a dispute, Customer must notify Wells Fargo of its dispute within sixty (60) days from the transaction date of purchase. Each request to Wells Fargo must be in writing and contain the following information: (i) Cardholder name; (ii) Card account number; (iii) the dollar amount of any billing dispute or suspected error; (iv) the reason for the dispute, and (v) summary of the steps already taken with the merchant to resolve the matter. Wells Fargo shall investigate the disputed amount and determine whether the amount is properly payable by Customer. Until Wells Fargo completes its investigation and determines whether the disputed amount is properly payable by Customer, Customer shall not be liable for the amount of the disputed transaction. Customer agrees that its failure to dispute a charge or other item within sixty (60) days from the transaction date of purchase shall constitute a waiver of any right the Customer may have to dispute the charge. In the event that transactions are posted to the accounts as a result of any circumstance under which the honoring merchant may be held liable under applicable Visa rules, Wells Fargo shall attempt to charge the transaction back to the merchant in accordance with Visa procedures. However, such attempted chargeback by Wells Fargo shall not relieve Customer of liability for the amount of the transaction even though the transaction may have been provisionally credited to the Customer's accounts.

**9.  Default.**  The occurrence of any of the following conditions or events shall constitute an **"Event of Default"** by Customer under this Agreement in which case, any unpaid balances on the Card shall become immediately due and payable, and Wells Fargo may immediately debit the Account for payment of such balances: (1) a payment is not made when due or payments to Wells Fargo are returned or reversed for any reason; (2) a term of this Agreement is breached in any way; (3) Customer defaults under the terms of any other agreement with Wells Fargo or any of its subsidiaries or affiliates; (4) a bankruptcy petition is filed by or against Customer or any guarantor of Customer's account; (5) a significant change occurs in the ownership or organizational structure of Customer or in the type or volume of Customer's business; (6) Customer becomes insolvent or is dissolved; (7) there shall exist or occur any event or condition which Wells Fargo in good faith believes impairs, or is substantially likely to impair, the prospect of payment or performance by Customer of its obligations under this Agreement; (8) Customer intentionally fails to submit required information Wells Fargo deems necessary; (9) Customer's account balance exceeds the Credit Limit; or (10) any financial statement or certificate furnished to Wells Fargo in connection with, or any representation or warranty made by Customer or any

other party under this Agreement, shall prove to have been incorrect, false or misleading in any material respect when furnished or made.

**10. Term; Right to Terminate.** Wells Fargo or Customer may, upon at least thirty (30) days prior written notice to the other party, and with or without cause, (i) terminate this Agreement, (ii) terminate one or more services provided for in this Agreement, or (iii) terminate one or more Cards. In addition, Wells Fargo may take any one or more of the actions referred to in the immediately preceding sentence immediately, without prior notice to Customer, upon the occurrence of an Event of Default. If Customer has enrolled in CCER, any such notice required under this Agreement may be delivered to Customer electronically in the same manner that statements are delivered. If Wells Fargo terminates the Agreement, or upon the expiration of this Agreement, (i) all Cards shall automatically expire, (ii) Customer shall immediately, upon notice from Wells Fargo, destroy all Cards, (iii) Customer will continue to be responsible for full payment of the current balance on the Card and all purchases, fees and charges incurred before termination that post after termination, including, without limitation, recurring transactions that post after termination, and (iv) any unpaid balances on the Cards shall become immediately due and payable, and Wells Fargo may immediately debit the Account for payment of such balances. If Wells Fargo terminates one or more Cards but not the Agreement, Customer shall immediately, upon notice from Wells Fargo, destroy all such Cards. Upon termination of the Agreement, Customer acknowledges and agrees that Customer's Demand Deposit Account and any all collateral or guarantees in support of this Agreement will remain in place for a period of sixty (60) days from the termination date to satisfy all payment obligations of Customer under this Agreement. Customer may, at any time, terminate the authority of any Cardholder to use the Card. Such termination by Customer shall become effective upon written or electronic notice via the internet to Wells Fargo along with written confirmation that the Cardholder's Card has been destroyed.

**11. Liability of Wells Fargo.** Wells Fargo's liability hereunder shall be limited to Customer's actual money damages caused directly by Wells Fargo's breach of this Agreement (except to the extent such liability is further limited by the terms of this Agreement), and Wells Fargo shall not be liable for any other matters whatsoever, including, without limitation: (i) Customer's use of the Card, (ii) the inability of Customer to use the Card or the unavailability of WellsOne Commercial Card reports or authorizations as a result of circumstances beyond Wells Fargo's control (such as, without limitation, fire, flood or the disruption of power, phone or computer service), or (iii) transmission errors or data security problems, or other acts or omissions, on the part of third parties (including, without limitation, third-party service providers in connection with transaction files sent to Customer or its designee). Notwithstanding the foregoing, in no event shall Wells Fargo be liable for any indirect, incidental, special, consequential or punitive damages, even if Wells Fargo has been advised of the possibility of any such damages.

**12. Changes to Agreement or to Credit Limit; Other Changes.** In addition to, and not in lieu of, Wells Fargo's termination rights in Section Ten (10) above, Wells Fargo may unilaterally, in its sole discretion, (i) change the Credit Limit for any reason, including but not limited to changes as may be required by law, upon prompt notice to Customer, and/or (ii) change any of the terms of this Agreement or any Attachments hereto upon thirty (30) days prior written notice to Customer. Customer may change the designated Program Administrator(s) or the Account number upon an authorized officer's notice in writing or via the Internet to Wells Fargo.

**13. Foreign Currency Transactions.** If a Card is used to engage in a transaction in a currency other than U.S. dollars ("**Foreign Currency Transaction**"), that amount will be converted into U.S. dollars before posting to Customer's account.

**13.1 Foreign Currency Transaction Procedures:** If a Foreign Currency Transaction occurs, and the transaction is not converted to U.S. dollars by the merchant itself, Visa International will convert the transaction into a U.S. dollar amount by using its currency conversion procedure in effect at the time the transaction is processed. Currently, Visa regulations and procedures provide that the currency conversion rate they use is either (1) a wholesale market rate, which rate may vary from the rate Visa International itself receives or (2) a government-mandated rate for the applicable currency as determined under Visa regulations and procedures, as applicable. This rate may differ from the rate in effect when the transaction occurred or when it was posted to the Cardholder's account.

**13.2 Point of Sale Currency Conversion:** Some merchants outside of the United States offer Cardholders the option of having card transactions converted to U.S. dollars by the merchant itself during the transaction ("**Point of Sale Currency Conversion**"). If that option is chosen the transaction is actually originated in U.S. dollars and the currency conversion rate is determined solely by the merchant. For each Foreign Currency Transaction that has been converted into a U.S. dollar amount by Visa, and for each Point of Sale Currency Conversion transaction where a non-U.S. merchant originates a transaction in U.S. dollars, Wells Fargo will charge Customer a 1% fee ("**Cross Border Transactional Fee**").

**14. Financial Information.** Promptly upon Wells Fargo's request, Customer shall provide, in form and detail satisfactory to Wells Fargo, current audited financial statements and supporting footnotes and schedules.

**15.  Confidential and Proprietary Information.**  (a). Customer and Wells Fargo acknowledge and agree that, in connection with this Agreement, it may be necessary and/or desirable to exchange information that may be proprietary or confidential to the disclosing party.  Therefore, it is agreed that all information heretofore or hereafter provided by one party to the other in connection with this Agreement, whether such information is provided verbally, in written form, in electronic form or any other form, shall be deemed to constitute confidential and proprietary information of the disclosing party (**"Confidential Information"**).  All Confidential Information shall remain the property of the disclosing party.

(b). Subject to Subsection (c), below: (i) each party shall keep all Confidential Information received from the other party in strict confidence for a period of three (3) years after its disclosure, (ii) the receiving party shall protect Confidential Information, whether it is in storage or in use, with the same degree of care as the receiving party normally uses to protect its own confidential or proprietary information against public disclosure, but in no event shall the receiving party use any less than reasonable care to protect the same, (iii) Confidential Information shall be disclosed by the receiving party only to those of its and its affiliates' internal personnel, attorney(s) and/or accountant(s) who have a need to know, and such disclosure shall be made only under conditions of confidentiality consistent with this Section 15, and (iv) each party shall use Confidential Information received from the other party in connection with this Agreement only and not for any other purpose whatsoever.

(c). Subsection (b), above shall not restrict disclosure or use of any Confidential Information that is:  (i) already known by the receiving party at the time of disclosure by the disclosing party, (ii) obtained from a source other than the disclosing party through no breach of this Section 15 by the receiving party, (iii) developed independently by the receiving party without reliance upon information received from the other party in connection with this Agreement, (iv) in the public domain when received or thereafter enters the public domain through no breach of this Section 15 by the receiving party, (v) provided by the receiving party to a third party with the prior written approval of the disclosing party, and/or (vi) disclosed by the receiving party pursuant to a court order or official government action, provided that the receiving party first notifies the disclosing party of the pending disclosure pursuant to such court order or official government action.

(d). Each party hereby acknowledges that a breach of this Agreement by the receiving party will cause damage to the disclosing party that may not be adequately compensated by money damages alone, and therefore, in the event of a breach or threatened breach by the receiving party, the non-breaching party shall be entitled to seek preliminary and permanent injunctive relief as well as such additional remedies as may be available at law or in equity.

**16.  No Waiver; Right of Set-Off.**  Neither party's failure to exercise any right or to pursue any remedy under this Agreement or otherwise shall constitute a waiver thereof.  Wells Fargo shall have the right to, in its sole discretion, set-off or recoup any obligation of Customer to Wells Fargo under this Agreement or otherwise against any obligation Wells Fargo owes to Customer, including a set-off against any deposit account(s) Customer has with Wells Fargo to the extent permitted by law.

**17.    Miscellaneous; Entire Agreement; Governing Law; Counterparts; No Assignment; Independent Contractor; Severability.**  This Agreement contains the entire understanding between the parties on the subject matter hereof and supersedes all prior agreements, negotiations and representations.  This Agreement shall be governed by and construed in accordance with the laws of the State of South Dakota.  This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be deemed to be an original, and all of which when taken together shall constitute one and the same Agreement. Customer may not assign this Agreement or any of its rights, interest or obligations hereunder (by operation of law or otherwise). Nothing contained in this Agreement shall be construed as constituting or creating a partnership, joint venture, agency, or other association or relationship between Wells Fargo and Customer.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**18.  Arbitration.**  The parties hereto agree, upon demand by any party, to submit to binding arbitration all claims, disputes and controversies between or among them (and their respective employees, officers, directors, attorneys, and other agents), whether in tort, contract or otherwise in any way arising out of or relating to (i) any credit subject hereto, or the Agreement and its negotiation, execution, collateralization, administration, repayment, modification, extension, substitution, formation, inducement, enforcement, default or termination; or (ii) requests for additional credit.

**18.1.  Governing Rules.**  Any arbitration proceeding will (i) proceed in a location in South Dakota selected by the American Arbitration Association (**"AAA"**); (ii) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between the parties; and (iii) be conducted by the AAA, or such other administrator as the parties shall mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000.00 exclusive of claimed interest, arbitration fees and costs in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes to be referred to herein, as applicable, as the **"Rules"**).  If there is any inconsistency between the terms hereof and the

Rules, the terms and procedures set forth herein shall control. Any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any dispute. Nothing contained herein shall be deemed to be a waiver by any party that is a bank of the protections afforded to it under 12 U.S.C. §91 or any similar applicable state law.

**18.2. No Waiver of Provisional Remedies; Self-Help and Foreclosure.** The arbitration requirement does not limit the right of any party to (i) foreclose against real or personal property collateral; (ii) exercise self-help remedies relating to collateral or proceeds of collateral such as setoff or repossession; or (iii) obtain provisional or ancillary remedies such as replevin, injunctive relief, attachment or the appointment of a receiver, before during or after the pendency of any arbitration proceeding. This exclusion does not constitute a waiver of the right or obligation of any party to submit any dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in sections (i), (ii) and (iii) of this paragraph.

**18.3. Arbitrator Qualifications and Powers.** Any arbitration proceeding in which the amount in controversy is $5,000,000.00 or less will be decided by a single arbitrator selected according to the Rules, and who shall not render an award of greater than $5,000,000.00. Any dispute in which the amount in controversy exceeds $5,000,000.00 shall be decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations. The arbitrator will be a neutral attorney licensed in the State of South Dakota or a neutral retired judge of the state or federal judiciary of South Dakota, in either case with a minimum of ten years experience in the substantive law applicable to the subject matter of the dispute to be arbitrated. The arbitrator will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim. In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication. The arbitrator shall resolve all disputes in accordance with the substantive law of South Dakota and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award. The arbitrator shall also have the power to award recovery of all costs and fees, to impose sanctions and to take such other action as the arbitrator deems necessary to the same extent a judge could pursuant to the Federal Rules of Civil Procedure, the South Dakota Rules of Civil Procedure or other applicable law. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

**18.4. Discovery.** In any arbitration proceeding, discovery will be permitted in accordance with the Rules. All discovery shall be expressly limited to matters directly relevant to the dispute being arbitrated and must be completed no later than 20 days before the hearing date. Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

**18.5. Class Proceedings and Consolidations.** No party hereto shall be entitled to join or consolidate disputes by or against others in any arbitration, except parties who have executed the Agreement, or to include in any arbitration any dispute as a representative or member of a class, or to act in any arbitration in the interest of the general public or in a private attorney general capacity.

**18.6. Payment Of Arbitration Costs And Fees.** The arbitrator shall award all costs and expenses of the arbitration proceeding.

**18.7. Miscellaneous.** To the maximum extent practicable, the AAA, the arbitrators and the parties shall take all action required to conclude any arbitration proceeding within 180 days of the filing of the dispute with the AAA. No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in the ordinary course of its business or by applicable law or regulation. If more than one agreement for arbitration by or between the parties potentially applies to a dispute, the arbitration provision most directly related to the Agreement or the subject matter of the dispute shall control. This arbitration provision shall survive termination, amendment or expiration of the Agreement or any relationship between the parties.

**19. Verification of Identity.** Customer acknowledges that Wells Fargo may be required by applicable law, including Executive Order 13224 (or successor orders/legislation), to screen the names of individual Cardholders against the Specially Designated Nationals and Blocked Persons list published by the Office of Foreign Assets Control of the U.S. Department of the Treasury, or otherwise verify such person's identity. Customer agrees to cooperate with Wells Fargo in this regard and to provide to Wells Fargo personally identifiable information about any Cardholder, upon Wells Fargo's request. In the event that Customer does not comply with the terms of this section, Wells Fargo will have the right, in its sole and absolute discretion, to terminate immediately any Card issued in the name of such individual(s), and Customer shall not permit such individual(s) to use any other Cards issued pursuant to this Agreement.

**20. Secured Obligations.** Customer hereby acknowledges and agrees that Customer's obligations, liabilities and indebtedness arising under the Card and this Agreement are secured by Money Market Savings Account Number ███████7216 with a minimum

amount of $75,000.00, or such other amount as agreed to in writing by Wells Fargo, maintained by Customer with Wells Fargo Bank, N.A., all funds now or hereafter on deposit therein, and any interest now or hereafter earned thereon, pursuant to that certain Security Agreement: Specific Rights to Payment dated on or about 4/29/, 2011 (as the same has been and may be further amended, modified, confirmed and/or ratified from time to time, the "Security Agreement") granted by the Customer to Wells Fargo. All of the foregoing shall be evidenced by and subject to the terms of such security agreements, financing statements and other documents as Wells Fargo shall reasonably require, all in form and substance satisfactory to Wells Fargo. Customer shall pay to Wells Fargo immediately upon demand the full amount of all charges, costs and expenses (to include fees paid to third parties and all allocated costs of Wells Fargo personnel), expended or incurred by Wells Fargo in connection with any of the foregoing security, including without limitation, filing and recording fees and costs.

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

Authorized Officer: Michael C. Williams

Signature:

Title: Vice President

Date: 5/4/11

**MaxWest Environmental Systems, Inc.**

Authorized Officer: Christopher Peters

Signature: Christopher Peters

Title: Chief Financial Officer

Date: 5/2/2011

**WELLSONE℠ COMMERCIAL CARD EXPRESS AGREEMENT**
**ATTACHMENT A**
**PROGRAM INFORMATION**

CUSTOMER NAME:      **MaxWest Environmental Systems, Inc.**

TAX I.D.:        ████████

ADDRESS:       **114 W. 1st Street, Suite 220**
               **Sanford, FL 32771**

NAME(S) OF PROGRAM ADMINISTRATOR(S):      **Andy Meiers**
*(ADDITIONAL INFORMATION REQUIRED ON ATTACHMENT B)*      **Chris Peters**

INITIAL CREDIT LIMIT:   **$75,000**

WELLS FARGO DEMAND DEPOSIT ACCOUNT NUMBER & ROUTING NUMBER: ████**4535**      ████**0248**
                                                             Account Number        Routing Number

BILLING STATEMENT CYCLE:      **MONTHLY**

Authorized Company Officer: *Christopher Peters*

Signature: *Christopher Peters*

Title: *C.F.O.*

Date: *5/2/2011*

1162574 v1 01/10

**WELLSONE® COMMERCIAL CARD EXPRESS AGREEMENT**
**ATTACHMENT B**
**PROGRAM ADMINISTRATOR**
**MaxWest Environmental Systems, Inc.**

Please provide the following information about each Program Administrator whose name appears on the attached Agreement and Authorization:

Program Administrator 1:
**Andy Meiers / Controller**
(Name/Title)

**114 W. 1st Street, Suite 220**
(Mailing Address 1)

**Sanford, FL 32771**
(City, State, Zip Code)

**407-328-4992**          **407-320-9995**
(Telephone)            (Fax)

**ameiers@maxwestenergy.com**
(Email Address)

Program Administrator 2:
**Chris Peters / CFO**
(Name/Title)

**114 W. 1st Street, Suite 220**
(Mailing Address 1)

**Sanford, FL 32771**
(City, State, Zip Code)

**407-328-4992**          **407-320-9995**
(Telephone)            (Fax)

**cpeters@maxwestenergy.com**
(Email Address)

Program Administrator 3:
_____
(Name/Title)

_____
(Mailing Address 1)

_____
(City, State, Zip Code)

_____          _____
(Telephone)            (Fax)

_____
(Email Address)

Program Administrator 4:
_____
(Name/Title)

_____
(Mailing Address 1)

_____
(City, State, Zip Code)

_____          _____
(Telephone)            (Fax)

_____
(Email Address)

(add additional pages as necessary)

Program Administrator designated to receive all Commercial Card Visa Cards: **Andy Meiers**

The undersigned authorized officer of Customer certifies that the foregoing is true and correct and that the Program Administrators listed above are authorized to act on Customer's behalf and are vested with the authority set forth in Section 4 of the Agreement.

By: _Christopher Peter_
(Signature of Authorized Officer)

Title: _CFO_

Date: _5/2/2011_

1162574 v1 01/10

WELLSONE<sup>SM</sup> COMMERCIAL CARD EXPRESS AGREEMENT
ATTACHMENT C
FEE SCHEDULE
MaxWest Environmental Systems, Inc.

**_STANDARD FEES:_**
   ONE TIME FEES:
      Set-up fee                                 $ ███

**RECURRING FEES:**
      Card Issuance                          $ ████
      CCER Express Reporting Solution        $ ████

After the 6 month pilot period is complete, a fee of $███ per transaction will be assessed for any month in which both the minimum thresholds of $███ monthly net purchasing volume and $███ average ticket are not met.

**MISCELLANEOUS FEES (Applicable Only If Customer Uses This Service):**
   Cash Advance Fee      ██████
   Rush Card             $ ██████ .
   Phone Re-Training     $ ██████

For those customers who opt to use ACH reimbursement for out-of-pocket expenses, separate ACH fees will apply.
For those customers who opt to use the Commercial Card Expense Reporting solution, accessed through the Commercial Electronic Office (CEO), separate CEO access charges may apply.

Authorized Company Officer: _Christopher Peters_
Signature: _Christopher Peters_
Title: _CFO_
Date: _5/2/2011_

1162574 v1 01/10

**EXHIBIT B**

## SECURITY AGREEMENT:
## SPECIFIC RIGHTS TO PAYMENT

1.    **GRANT OF SECURITY INTEREST.** For valuable consideration, the undersigned <u>MAXWEST ENVIRONMENTAL SYSTEMS, INC.</u>, or any of them ("**Debtor**"), hereby grants and transfers to WELLS FARGO BANK, NATIONAL ASSOCIATION ("**Bank**") a security interest in the following accounts, deposit accounts, chattel paper (whether electronic or tangible), instruments, promissory notes, documents, general intangibles, payment intangibles, software, letter of credit rights, health-care insurance receivables and other rights to payment (collectively called "**Collateral**"):

**Money Market Savings Account Number ▆▆▆▆7216 maintained by Debtor with Wells Fargo Bank, N.A., all funds now or hereafter on deposit therein, and any Interest now or hereafter earned thereon,**

and all renewals thereof, including all securities, guaranties, warranties, indemnity agreements, insurance policies, supporting obligations and other agreements pertaining to the same or the property described therein, together with whatever is receivable or received when any of the Collateral or proceeds thereof are sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, including without limitation, all rights to payment, including returned premiums, with respect to any insurance relating to any of the foregoing, and all rights to payment with respect to any claim or cause of action affecting or relating to any of the foregoing (hereinafter called "**Proceeds**").

2.    **OBLIGATIONS SECURED.** The obligations secured hereby are the payment and performance of all present and future Indebtedness of Debtor to Bank in connection with: (a) that certain WellsOne® Commercial Card Express Agreement dated or about 4/29, 2011 (as the same may have been, or may be in the future, amended, supplemented or restated from time to time), together with all extensions, renewals and/or modifications of the foregoing, and (b) all obligations of Debtor and rights of Bank under this Agreement.  The word "**Indebtedness**" is used herein in its most comprehensive sense and includes any and all advances, debts, obligations and liabilities of Debtor, or any of them, heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including under any swap, derivative, foreign exchange, hedge, deposit, treasury management or other similar transaction or arrangement, and whether Debtor may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable.

3.    **TERMINATION.** This Agreement will terminate upon the performance of all obligations of Debtor to Bank, including without limitation, the payment of all Indebtedness of Debtor to Bank, and the termination of all commitments of Bank to extend credit to Debtor, existing at the time Bank receives written notice from Debtor of the termination of this Agreement.

4.    **OBLIGATIONS OF BANK.** Bank has no obligation to make any loans hereunder. Any money received by Bank in respect of the Collateral may be deposited, at Bank's option, into a non-interest bearing account over which Debtor shall have no control, and the same shall, for all purposes, be deemed Collateral hereunder.

5.      REPRESENTATIONS AND WARRANTIES.  Debtor represents and warrants to Bank that: (a) Debtor's legal name is exactly as set forth on the first page of this Agreement, and all of Debtor's organizational documents or agreements delivered to Bank are complete and accurate in every respect; (b) Debtor is the owner and has possession or control of the Collateral and Proceeds; (c) Debtor has the exclusive right to grant a security interest in the Collateral and Proceeds; (d) all Collateral and Proceeds are genuine, free from liens, adverse claims, setoffs, default, prepayment, defenses and conditions precedent of any kind or character, except the lien created hereby or as otherwise agreed to by Bank, or as heretofore disclosed by Debtor to Bank, in writing; (e) all statements contained herein and, where applicable, in the Collateral are true and complete in all material respects; (f) no financing statement covering any of the Collateral or Proceeds, and naming any secured party other than Bank, is on file in any public office; (g) all persons appearing to be obligated on Collateral and Proceeds have authority and capacity to contract and are bound as they appear to be; (h) all property subject to chattel paper has been properly registered and filed in compliance with law and to perfect the interest of Debtor in such property; and (i) all Collateral and Proceeds comply with all applicable laws concerning form, content and manner of preparation and execution, including where applicable Federal Reserve Regulation Z and any State consumer credit laws.

6.      COVENANTS OF DEBTOR.

(a)      Debtor agrees in general: (i) to pay Indebtedness secured hereby when due; (ii) to indemnify Bank against all losses, claims, demands, liabilities and expenses of every kind caused by property subject hereto; (iii) to permit Bank to exercise its powers; (iv) to execute and deliver such documents as Bank deems necessary to create, perfect and continue the security interests contemplated hereby; (v) not to change its name, and as applicable, its chief executive office, its principal residence or the jurisdiction in which it is organized and/or registered without giving Bank prior written notice thereof; (vi) not to change the places where Debtor keeps any Collateral or Debtor's records concerning the Collateral and Proceeds without giving Bank prior written notice of the address to which Debtor is moving same; and (vii) to cooperate with Bank in perfecting all security interests granted herein and in obtaining such agreements from third parties as Bank deems necessary, proper or convenient in connection with the preservation, perfection or enforcement of any of its rights hereunder.

(b)      Debtor agrees with regard to the Collateral and Proceeds, unless Bank agrees otherwise in writing: (i) that Bank is authorized to file financing statements in the name of Debtor to perfect Bank's security interest in Collateral and Proceeds; (ii) where applicable, to insure the Collateral with Bank named as loss payee, in form, substance and amounts, under agreements, against risks and liabilities, and with insurance companies satisfactory to Bank; (iii) not to permit any lien on the Collateral or Proceeds, except in favor of Bank; (iv) not to sell, hypothecate or otherwise dispose of, nor permit the transfer by operation of law of, any of the Collateral or Proceeds or any interest therein, nor withdraw any funds from any deposit account pledged to Bank hereunder; (v) to keep, in accordance with generally accepted accounting principles, complete and accurate records regarding all Collateral and Proceeds, and to permit Bank to inspect the same and make copies thereof at any reasonable time; (vi) if requested by Bank, to receive and use reasonable diligence to collect Proceeds, in trust and as the property of Bank, and to immediately endorse as appropriate and deliver such Proceeds to Bank daily in the exact form in which they are received together with a collection report in form satisfactory to Bank; (vii) not to commingle Collateral or Proceeds, or collections thereunder, with other property; (viii) in the event Bank elects to receive payments of Collateral and Proceeds hereunder, to pay all expenses incurred by Bank in connection therewith, including expenses of accounting, correspondence, collection efforts, reporting to account or contract debtors, filing, recording,

record keeping and expenses incidental thereto; and (ix) to provide any service and do any other acts which may be necessary to keep all Collateral and Proceeds free and clear of all defenses, rights of offset and counterclaims.

7.      POWERS OF BANK.  Debtor appoints Bank its true attorney in fact to perform any of the following powers, which are coupled with an interest, are irrevocable until termination of this Agreement and may be exercised from time to time by Bank's officers and employees, or any of them, whether or not Debtor is in default: (a) to perform any obligation of Debtor hereunder in Debtor's name or otherwise; (b) to give notice to account debtors or others of Bank's rights in the Collateral and Proceeds, to enforce or forebear from enforcing the same and make extension or modification agreements with respect thereto; (c) to release persons liable on Collateral or Proceeds and to give receipts and acquittances and compromise disputes in connection therewith; (d) to release or substitute security; (e) to resort to security in any order; (f) to prepare, execute, file, record or deliver notes, assignments, schedules, designation statements, financing statements, continuation statements, termination statements, statements of assignment, applications for registration or like papers to perfect, preserve or release Bank's interest in the Collateral and Proceeds; (g) to receive, open and read mail addressed to Debtor; (h) to take cash, instruments for the payment of money and other property to which Bank is entitled; (i) to verify facts concerning the Collateral and Proceeds by inquiry of obligors thereon, or otherwise, in its own name or a fictitious name; (j) to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to Proceeds; (k) to prepare, adjust, execute, deliver and receive payment under insurance claims, and to collect and receive payment of and endorse any instrument in payment of loss or returned premiums or any other insurance refund or return, and to apply such amounts received by Bank, at Bank's sole option, toward repayment of the Indebtedness; (l) to exercise all rights, powers and remedies which Debtor would have, but for this Agreement, with respect to all Collateral and Proceeds subject hereto; (m) to make withdrawals from and to close deposit accounts or other accounts with any financial institution, wherever located, into which Proceeds may have been deposited, and to apply funds so withdrawn to payment of the Indebtedness; (n) to preserve or release the interest evidenced by chattel paper to which Bank is entitled hereunder and to endorse and deliver any evidence of title incidental thereto; and (o) to do all acts and things and execute all documents in the name of Debtor or otherwise, deemed by Bank as necessary, proper and convenient in connection with the preservation, perfection or enforcement of its rights hereunder.

8.      PAYMENT OF PREMIUMS, TAXES, CHARGES, LIENS AND ASSESSMENTS. Debtor agrees to pay, prior to delinquency, all insurance premiums, taxes, charges, liens and assessments against the Collateral and Proceeds, and upon the failure of Debtor to do so, Bank at its option may pay any of them and shall be the sole judge of the legality or validity thereof and the amount necessary to discharge the same. Any such payments made by Bank shall be obligations of Debtor to Bank, due and payable immediately upon demand, together with interest at a rate determined in accordance with the provisions of this Agreement, and shall be secured by the Collateral and Proceeds, subject to all terms and conditions of this Agreement.

9.      EVENTS OF DEFAULT.  The occurrence of any of the following shall constitute an "Event of Default" under this Agreement: (a) any default in the payment or performance of any obligation, or any defined event of default, under (i) any contract or instrument evidencing any Indebtedness, or (ii) any other agreement between Debtor and Bank, including without limitation any loan agreement, relating to or executed in connection with any Indebtedness; (b) any representation or warranty made by Debtor herein shall prove to be incorrect, false or misleading in any material respect when made; (c) Debtor shall fail to observe or perform any

obligation or agreement contained herein; (d) any impairment of the rights of Bank in any Collateral or Proceeds, or any attachment or like levy on any property of Debtor; and (e) Bank, in good faith, believes any or all of the Collateral and/or Proceeds to be in danger of misuse, dissipation, commingling, loss, theft, damage or destruction, or otherwise in jeopardy or unsatisfactory in character or value.

10.    REMEDIES.  Upon the occurrence of any Event of Default, Bank shall have the right to declare immediately due and payable all or any Indebtedness secured hereby and to terminate any commitments to make loans or otherwise extend credit to Debtor.  Bank shall have all other rights, powers, privileges and remedies granted to a secured party upon default under the Florida Uniform Commercial Code or otherwise provided by law, including without limitation, the right (a) to contact all persons obligated to Debtor on any Collateral or Proceeds and to instruct such persons to deliver all Collateral and/or Proceeds directly to Bank, and (b) to sell, lease, license or otherwise dispose of any or all Collateral.  All rights, powers, privileges and remedies of Bank shall be cumulative.  No delay, failure or discontinuance of Bank in exercising any right, power, privilege or remedy hereunder shall affect or operate as a waiver of such right, power, privilege or remedy; nor shall any single or partial exercise of any such right, power, privilege or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power, privilege or remedy.  Any waiver, permit, consent or approval of any kind by Bank of any default hereunder, or any such waiver of any provisions or conditions hereof, must be in writing and shall be effective only to the extent set forth in writing.  It is agreed that public or private sales or other dispositions, for cash or on credit, to a wholesaler or retailer or investor, or user of property of the types subject to this Agreement, or public auctions, are all commercially reasonable since differences in the prices generally realized in the different kinds of dispositions are ordinarily offset by the differences in the costs and credit risks of such dispositions.  While an Event of Default exists: (a) Debtor will deliver to Bank from time to time, as requested by Bank, current lists of all Collateral and Proceeds; (b) Debtor will not dispose of any Collateral or Proceeds except on terms approved by Bank; (c) Bank may, at any time and at Bank's sole option, liquidate any time deposits pledged to Bank hereunder and apply the Proceeds thereof to payment of the Indebtedness, whether or not said time deposits have matured and notwithstanding the fact that such liquidation may give rise to penalties for early withdrawal of funds; and (d) at Bank's request, Debtor will assemble and deliver all Collateral and Proceeds, and books and records pertaining thereto, to Bank at a reasonably convenient place designated by Bank.  Debtor further agrees that Bank shall have no obligation to process or prepare any Collateral for sale or other disposition.

11.    DISPOSITION OF COLLATERAL AND PROCEEDS; TRANSFER OF INDEBTEDNESS.  In disposing of Collateral hereunder, Bank may disclaim all warranties of title, possession, quiet enjoyment and the like.  Any proceeds of any disposition of any Collateral or Proceeds, or any part thereof, may be applied by Bank to the payment of expenses incurred by Bank in connection with the foregoing, including reasonable attorneys' fees, and the balance of such proceeds may be applied by Bank toward the payment of the Indebtedness in such order of application as Bank may from time to time elect.  Upon the transfer of all or any part of the Indebtedness, Bank may transfer all or any part of the Collateral or Proceeds and shall be fully discharged thereafter from all liability and responsibility with respect to any of the foregoing so transferred, and the transferee shall be vested with all rights and powers of Bank hereunder with respect to any of the foregoing so transferred; but with respect to any Collateral or Proceeds not so transferred Bank shall retain all rights, powers, privileges and remedies herein given.

12.    **STATUTE OF LIMITATIONS.** Until all Indebtedness shall have been paid in full and all commitments by Bank to extend credit to Debtor have been terminated, the power of sale or other disposition and all other rights, powers, privileges and remedies granted to Bank hereunder shall continue to exist and may be exercised by Bank at any time and from time to time irrespective of the fact that the Indebtedness or any part thereof may have become barred by any statute of limitations, or that the personal liability of Debtor may have ceased, unless such liability shall have ceased due to the payment in full of all Indebtedness secured hereunder.

13.    **MISCELLANEOUS.** When there is more than one Debtor named herein: (a) the word "Debtor" shall mean all or any one or more of them as the context requires; (b) the obligations of each Debtor hereunder are joint and several; and (c) until all Indebtedness shall have been paid in full, no Debtor shall have any right of subrogation or contribution, and each Debtor hereby waives any benefit of or right to participate in any of the Collateral or Proceeds or any other security now or hereafter held by Bank. Debtor hereby waives any right to require Bank to (i) proceed against Debtor or any other person, (ii) marshal assets or proceed against or exhaust any security from Debtor or any other person, (iii) perform any obligation of Debtor with respect to any Collateral or Proceeds, and (d) make any presentment or demand, or give any notice of nonpayment or nonperformance, protest, notice of protest or notice of dishonor hereunder or in connection with any Collateral or Proceeds. Debtor further waives any right to direct the application of payments or security for any Indebtedness of Debtor or indebtedness of customers of Debtor.

14.    **NOTICES.** All notices, requests and demands required under this Agreement must be in writing, addressed to Bank at the address specified in any other loan documents entered into between Debtor and Bank and to Debtor at the address of its chief executive office (or principal residence, if applicable) specified below or to such other address as any party may designate by written notice to each other party, and shall be deemed to have been given or made as follows: (a) if personally delivered, upon delivery; (b) if sent by mail, upon the earlier of the date of receipt or three (3) days after deposit in the U.S. mail, first class and postage prepaid; and (c) if sent by telecopy, upon receipt.

15.    **COSTS, EXPENSES AND ATTORNEYS' FEES.** Debtor shall pay to Bank immediately upon demand the full amount of all payments, advances, charges, costs and expenses, including reasonable attorneys' fees (to include outside counsel fees and all allocated costs of Bank's in-house counsel), expended or incurred by Bank in connection with (a) the perfection and preservation of the Collateral or Bank's interest therein, and (b) the realization, enforcement and exercise of any right, power, privilege or remedy conferred by this Agreement, whether incurred at the trial or appellate level, in an arbitration proceeding or otherwise, and including any of the foregoing incurred in connection with any bankruptcy proceeding (including without limitation, any adversary proceeding, contested matter or motion brought by Bank or any other person) relating to Debtor or in any way affecting any of the Collateral or Bank's ability to exercise any of its rights or remedies with respect thereto. All of the foregoing shall be paid by Debtor with interest from the date of demand until paid in full at a rate per annum equal to the greater of ten percent (10%) or Bank's Prime Rate in effect from time to time.

16.    **SUCCESSORS; ASSIGNS; AMENDMENT.** This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, legal representatives, successors and assigns of the parties, and may be amended or modified only in writing signed by Bank and Debtor.

17.    OBLIGATIONS OF MARRIED PERSONS. Any married person who signs this Agreement as Debtor hereby expressly agrees that recourse may be had against his or her separate property for all his or her Indebtedness to Bank secured by the Collateral and Proceeds under this Agreement.

18.    SEVERABILITY OF PROVISIONS. If any provision of this Agreement shall be held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or any remaining provisions of this Agreement.

19.    GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

Debtor warrants that Debtor is an organization registered under the laws of _Nevada_.

Debtor warrants that its chief executive office (or principal residence, if applicable) is located at the following address: _114 W. 1st Street   Sanford, FL   32771_.

IN WITNESS WHEREOF, this Agreement has been duly executed as of _5/2/2011_.

MAXWEST ENVIRONMENTAL SYSTEMS, INC.

_Christopher Peters_
By

_Christopher Peters_
Print

_CFO._
Title

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                     )        Case No. 6:14-bk-07685-KSJ

MAXWEST ENVIRONMENTAL            )        Chapter 7
SYSTEMS, INC.,
                                           )
        Debtor.
                                           )
_____)

**AFFIDAVIT OF ROANNE DISALVATORE IN SUPPORT
OF WELLS FARGO BANK, N.A.'S CONSENT MOTION
<u>FOR RELIEF FROM THE AUTOMATIC STAY</u>**

STATE OF FLORIDA
COUNTY OF BROWARD

        BEFORE ME the undersigned authority this day personally appeared Roanne

Disalvatore, who being by me first duly sworn, deposes and says:

        1.      I am over 18 years of age and have personal knowledge of the facts stated in this

Affidavit.  I am a Vice President of the Credit Resolution Group for Wells Fargo Bank, N.A.

("Wells Fargo"), and I have authority to make this Affidavit on behalf of Wells Fargo.

        2.      I am the bank officer for Wells Fargo with current responsibility for the accounts,

credit card services, and loan documents at issue in this matter and have personal knowledge of

the factual matters stated in Wells Fargo Bank, N.A.'s Consent Motion for Relief from the

Automatic Stay (the "Motion").

        3.      I have personal knowledge of the information contained in the records for the

accounts and loan file at issue in this matter as that information appears in the business records

of Wells Fargo.  Those records were made at or near the time of the occurrence of the matters set

forth therein by or from information transmitted by a person with knowledge of those matters.

Further, the business records were kept in the course of the regularly conducted activity and were made as part of the regularly conducted activity as a regular practice, and I routinely rely upon such records in the usual course of my business activity.

4.      Wells Fargo is the owner and holder of the: (i) WellsOne Commercial Card Express Agreement effective April 29, 2011 with an initial credit limit of $75,000.00 (the "Commercial Card Agreement"), and (ii) Security Agreement dated May 2, 2011 (the "Security Agreement"); each executed and delivered by MaxWest Environmental Systems, Inc. (the "Debtor") to Wells Fargo.

5.      True and correct copies[1] of the Commercial Card Agreement and the Security Agreement are attached as <u>Exhibit A</u> and <u>Exhibit B</u> to the Motion, respectively.

6.      Prior to July 3, 2014, Wells Fargo provided commercial credit card services to the Debtor (the "Credit Card Services") pursuant to the Commercial Card Agreement.

7.      In addition to providing the Credit Card Services, Wells Fargo also provided account services to the Debtor with respect to account numbers xxxxxx4535, xxxxxx7045 and xxxxxx7216 maintained by the Debtor with Wells Fargo (the "Account Services").

8.      As of July 3, 2014, the Debtor owes the total amount of $12,994.96 (the "Pre-Petition Balance") to Wells Fargo as follows: (i) Credit Card Services charges in the amount of $11,750.90, and (ii) Account Services charges in the amount of $1,180.53 on account number xxxxxx4535, $47.75 on account number xxxxxx7045 and $15.78 on account number xxxxxx7216.

9.      As of July 3, 2014, the balance of the Savings Account[2] was $100,218.03

---

[1] Subject to redaction
[2] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

10.    Pursuant to the request of the Chapter 7 trustee (the "Trustee"), Wells Fargo (i) terminated the Credit Card Services on July 25, 2014; and (ii) closed account number xxxxxx4535 on or before July 31, 2014, remitting any funds in the account to the Trustee. Account number xxxxxx7045 was closed prior to the Petition Date.


_____
Roanne Disalvatore
Vice President of the Credit Resolution Group
for Wells Fargo Bank, N.A.



Sworn and subscribed before me this _15_ day of _August_, 2014, by Roanne Disalvatore, as Vice President of the Credit Resolution Group for Wells Fargo Bank, N.A., who is personally known to me, or has produced _____ as identification.


_____
Notary Public, State of Florida
Printed Name:_____
Commission No.:_____
My commission expires:_____


Sharon Agri
Notary Public
State of Florida
My Commission Expires 09/26/2017
Commission No. FF 58253


878094.2

3

**EXHIBIT D**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                          )        Case No. 6:14-bk-07685-KSJ

MAXWEST ENVIRONMENTAL                           )        Chapter 7
SYSTEMS, INC.,
                                                )
        Debtor.
                                                )

## CHAPTER 7 TRUSTEE'S WRITTEN CONSENT

I, Richard B. Webber, as Chapter 7 trustee for the bankruptcy estate of MaxWest

Environmental Systems, Inc., hereby consent to the waiver of the 14-day period provided by Rule

4001(a)(3), Federal Rules of Bankruptcy Procedure, sought by Wells Fargo Bank, N.A. in its

Consent Motion for Relief from the Automatic Stay.

Dated: _____August 8_____, 2014.


Richard B. Webber, as Chapter 7
Trustee for the Bankruptcy Estate of
MaxWest Environmental Systems,
Inc.

Post Office Box 3000
Orlando, Florida 32802
(407) 425-7010

Chapter 7 Trustee

878120

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:                                              )          Case No. 6:14-bk-07685-KSJ

MAXWEST ENVIRONMENTAL                               )          Chapter 7
SYSTEMS, INC.,
                                                    )
        Debtor.
                                                    )
_____            )

**ORDER GRANTING WELLS FARGO BANK, N.A.'S
CONSENT MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

        This case came on for consideration on Wells Fargo Bank, N.A.'s Consent Motion for

Relief from the Automatic Stay [Doc. No. __] (the "Motion") filed by Wells Fargo Bank, N.A.

("Wells Fargo").  Wells Fargo served the Motion by negative notice and no appropriate response

was timely filed.  Accordingly, it is

        **ORDERED**:

        1.      The Motion [Doc. No. __] is granted.

        2.      The automatic stay arising by reason of 11 U.S.C. § 362 of the Bankruptcy Code

is terminated as to Wells Fargo's interest in the following property[1]:

                The money market savings account maintained by the Debtor with
                Wells Fargo identified as account number xxxxxx7216, with a
                balance of $100,218.03 as of the July 3, 2014 petition date.

        3.      The automatic stay is modified for the sole purpose of allowing Wells Fargo to

complete *in rem* relief and take all steps necessary to exercise any and all of its rights in the

collateral, including setoff and such further *in rem* relief as it deems appropriate.  Wells Fargo

shall not seek an *in personam* judgment against the Debtor.

---

[1] The property described in this paragraph 2 shall be referred to as the "Savings Account."

4.      Immediately upon entry of this Order, Wells Fargo is authorized to setoff the Pre-Petition Balance[2] owed to it (in the total amount of $12,994.96) against the funds in the Savings Account.

5.      Wells Fargo shall then retain possession of the remaining funds in the Savings Account until such time that the following procedure has been completed, all without further order of this Court: (i) Wells Fargo's calculation of all post-petition trailing charges, together with all related post-petition expenses, fees (including, but not limited to, attorneys' fees) and costs, incurred by Wells Fargo in connection with the Credit Card Services, the Commercial Card Agreement, the Account Services, and its efforts to recover from the Debtor such amounts by realizing on the funds in the Savings Account (the "Post-Petition Balance"), (ii) Wells Fargo's delivery of a written itemization of the Post-Petition Balance to the Trustee for review, (iii) the Trustee's written approval of the Post-Petition Balance, (iv) Wells Fargo's recovery of the Post-Petition Balance by realizing on the funds in the Savings Account, and (v) Wells Fargo's turnover of all funds remaining in the Savings Account (subsequent to Wells Fargo recovering the Post-Petition Balance from the funds in the Savings Account) and closure of the Savings Account.

6.      To the extent the Trustee has any objection to the Post-Petition Balance (and the Trustee and Wells Fargo are unable to resolve such objection), then the Trustee shall file a motion for turnover of the Savings Account, and Wells Fargo may not recover from the funds in the Savings Account any portion of the Post-Petition Balance to which the Trustee objects until this Court conducts a hearing and enters an order on the merits of the Trustee's motion for

---

[2] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

2

turnover.  Wells Fargo may file a response and/or a memorandum in opposition to the Trustee's motion for turnover.

       7.     The 14-day stay period pursuant to Bankruptcy Rule 4001(a)(3) is waived.

     DONE AND ORDERED in Orlando, Florida, on _____.


_____
KAREN S. JENNEMANN
Chief United States Bankruptcy Judge


Attorney Timothy R. Buskirk is directed to serve a copy of this order on interested parties and to file proof of service within three days of the entry of the order.

00878096.3

3